UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DENIM ZACHARY,

    Plaintiff,

    v.

FREELAND ENTERPRISES, INC., et al.,

    Defendants.

Case No. 3:23-CV-948-CCB-SJF

## <u>OPINION AND ORDER</u>

Plaintiff Denim Zachary originally filed this case on October 30, 2023. In an amended complaint filed on February 8, 2024, Mr. Zachary alleged that Defendants violated the Fair Labor Standards Act (FLSA) and Indiana employment law by failing to adequately reimburse him for the cost of using his personal vehicle to deliver pizza on their behalf. On June 4, 2024, the Court granted a conditional FLSA collective, permitting Plaintiff to send an opt-in notice to potential members. On March 14, 2025, Mr. Zachary moved for partial summary judgment on his FLSA claims. That same day, Defendants moved for this Court to decertify the FLSA collective. The Court now rules on both motions.

### BACKGROUND

Defendants own and operate a Pizza Hut where Plaintiff Mr. Zachary was employed as a delivery driver. (ECF 76 at 2). Mr. Zachary was required to use his own personal vehicle to make deliveries. (*Id.* at 2–3). Defendants paid Mr. Zachary a tipped wage for his deliveries, and also provided a mile-based reimbursement for his vehicle

expenses. (*Id.* at 3). The rate ranged between $0.28 and $0.37 per mile, and was calculated by a third-party provider (Motus). (*Id.* at 3). The Motus rate is based on a 3x3 matrix with two categories (car size class and model age), each containing three variations. (ECF 81 at 12). The rate also accounts for specific geographic region by zip code. (*Id.*). Still, it is based on averages—it does not reference a specific employee's actual costs. (*Id.*). The parties dispute whether this reimbursement scheme is adequate under the Fair Labor Standards Act, or whether it constitutes an improper "kick back" by shifting labor costs from the employer to the employee. (ECF 75). The parties also dispute whether an FLSA claim collective is proper in this case. (ECF 77). The Court will address each dispute in turn.

**ANALYSIS**

## I.  FLSA Claims

The FLSA requires employers to pay each employee a minimum wage "not less than" $7.25 an hour. 29 U.S.C. § 206(a)(1)(C). This law's natural consequence, reflected in Department of Labor ("DOL") regulations, is that an employer must pay the minimum wage "finally and unconditionally or 'free and clear'" without any kick-back "directly or indirectly to the employer or to another person for the employer's benefit." 29 C.F.R. § 531.35. In other words, an employer cannot "kick back" part of the minimum wage to itself by requiring an employee to pay the costs associated with employment, such as materials or tools.

The question in this case is to what extent the FLSA requires employers to reimburse employee delivery drivers who use their own personal vehicles. So far, the

2

Sixth Circuit is the only court of appeals to have addressed this issue. In *Parker v. Battle Creek Pizza, Inc.*, 95 F.4th 1009 (6th Cir. 2024), the court rejected an employer's argument that a "reasonable" average mileage reimbursement rate was sufficient under the FLSA, noting that the statute "specifies—to the penny—the minimum wage that an employer must pay 'each' of its employees," and that "[a]n employer must therefore pay each employee at least that amount, not a 'reasonable approximation' thereof." *Id.* at 1016.

According this opinion "respectful consideration" as non-binding circuit court precedent, *see OSF Healthcare Sys. v. Insperity Grp. Health Plan*, 82 F. Supp. 3d 860, 865 (C.D. Ill. 2015) (quoting *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994)), the Court agrees with its determination that the FLSA's minimum wage component requires reimbursement for exact specific costs rather than a reasonable approximation. Even a "reasonable approximation" might be less than the specific costs of some employees—thus violating the FLSA's individualized inquiry. 29 U.S.C. § 206(a)(1)(C).

While *Parker* pronounced what the FLSA requires, it did not establish how to account for specific cost in the context of personal vehicle use. Instead, it merely remanded the case to the district court with some "ideas" to "consider." *Id.* at 1019. Here, the parties dispute several aspects of the FLSA claim analysis: (1) how the evidentiary burdens in FLSA claims should be evaluated, (2) whether using the IRS mileage reimbursement rate is per se compliant with the FLSA, and (3) Plaintiff's specific vehicle cost claims.

In addition to the substantive analysis under the FLSA, the parties also dispute whether employers are obligated to maintain an employee's personal vehicle expense

records under the FLSA. This is relevant to how the evidentiary burden is evaluated in FLSA wage claims. Thus, the Court will first address the evidentiary burden dispute and proceed to address the core FLSA disputes.

### A. FLSA Recordkeeping Requirements

The parties contest whether the FLSA requires Defendants to maintain Plaintiff's vehicle cost records. This is an important question, because while the FLSA does not contain direct penalties for failure to maintain employment records, the Supreme Court has held that when recordkeeping is an employer's responsibility under the FLSA, the evidentiary burden may shift to the employer if the employee can show that he was improperly compensated. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).

The FLSA requires that employers must "make, keep and preserve" records of the "wages, hours and other conditions and practices of employment maintained by [the employer]." 29 U.S.C. § 211(c). The DOL regulations clarify that this includes "additions to or deductions from wages" 29 C.F.R. § 516.2(a)(10).

In this case, the relevant "records" are the various costs associated with Plaintiff's vehicle, including purchase price, fuel, and maintenance. The parties dispute whether these record types are covered by the "other conditions and practices of employment maintained by [the employer]" portion of the recordkeeping clause. Plaintiff argues that they must be included because the FLSA requires employers to reimburse employees for all vehicle costs related to their work, and that to hold

otherwise would unfairly reward employers by placing "a premium on an employer's failure to keep proper records." (ECF 76 at 14) (quoting *Anderson* at 687).

That interpretation is not the best reading of the clause, for several reasons. First, it would cut against plain statutory language. The FLSA dictates that employers must preserve records of employment conditions and practices only if they are "maintained by" the employer. 29 U.S.C. § 211(c). Complete personal vehicle cost records would include details such as the car purchase agreement, insurance plan, and maintenance history — records that are decidedly not "maintained by" an employer. *Id.* Perhaps, if an employer required the upkeep and maintenance of a work-specific vehicle with unique specifications, it might be required to record employee expenditures related to those requirements and specifications. *See, e.g.*, *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 10 (1st Cir. 2017), *aff'd*, 586 U.S. 105 (2019) (interstate trucking vehicles requiring a Commercial Driver's License); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 257–58 (S.D.N.Y. 2008) (delivery bikes and motorbikes for intra-city deliveries that were necessarily used primarily for employer's benefit). But here, there is no evidence that Defendants required Plaintiff to purchase a specific car type, equip it in a specific manner, or use a specific maintenance schedule. Those records would thus be "maintained by" the employee, not the employer, falling outside the clause's plain language. 29 U.S.C. § 211(c).

Plaintiff's interpretation would also render the recordkeeping clause absurd. Employers would have a legal burden to "make, keep, and preserve" records that they had no way to directly obtain, and which could constantly change without any notice.

For example, employers would have to track car purchase agreements, loan details, and insurance payment history for delivery employees. Employees may not even maintain those records for themselves. This would also be an ongoing obligation—an employer's "compliance" with the recordkeeping provision would ultimately depend on the employee's continued disclosure of vehicle related transactions. An interpretation requiring this result is highly unlikely to be correct. *See Am. Exp. Co. v. Maynard*, 177 U.S. 404, 414 (1900).

Plaintiff relies on *Anderson v. Mt. Clemens Pottery Co.*, where the Supreme Court held that when "the employer's records are inaccurate or inadequate," courts must not "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work." *Anderson*, 328 U.S. at 688. But *Anderson* dealt with records very different from those in this case—it concerned the time that employees spent at an employer's factory waiting between shifts and moving between tasks. *Id.* Thus, it concerned employee activity that was completely under the employer's direction and actually occurred entirely within the employer's factory.

Indeed, *Anderson* emphasized that the types of records envisioned by FLSA's recordkeeping provision are those that "employees seldom keep . . . themselves" and "even if they do, the records may be and frequently are untrustworthy." *Id.* at 687. Far from supporting Plaintiff's argument, *Anderson* actually cuts against it, emphasizing that FLSA's recordkeeping provision is directed to the types of records that an employer is better situated to make and maintain. This case is the inverse of *Anderson*— the employees are far better situated than employers with regard to vehicle-related

recordkeeping. In fact, they are the *only* party ultimately able to access those records in the first instance.

Plaintiff argues that "without these records, there would be no way to do what is required: reimburse each employee '100% of the cost' of the vehicles.'" (ECF 76 at 14 (quoting *Parker*, 95 F.4th at 1016)). That is wrong. It is completely possible for employers to reimburse employees for self-reported costs without placing the ultimate evidentiary burden on the employer in FLSA claims.

The DOL regulations reflect an interpretation which excludes personal vehicle records from employer's obligations, requiring that records must include all "records *used by the employer* in determining . . . additions to or deductions from wages paid." 29 C.F.R. § 516.6(c)(2) (emphasis added). The regulations clarify that an employer must keep any records that it *actually used* to calculate wages. Thus, the regulation concerns records *preservation*, not creation. 29 C.F.R. § 516.6 (regulation section title: "Records to be preserved 2 years"). Here, the debate centers around Defendants' alleged failure to obtain records in the first place, not failure to maintain them.

Finally, this Court's reading of the FLSA recordkeeping precision is in agreement with both the DOL's explicit guidance and other district courts. Dept. of Labor, Wage & Hour Div., Opinion Letter on Fair Labor Standards Act (FLSA2020-12) (Aug. 31, 2020), https://www.dol.gov/sites/dolgov/files/WHD/opinion-letters/FLSA/2020_08_31_12_FLSA.pdf.); *Sullivan v. PJ United, Inc.*, 363 F. Supp. 3d 1139, 1151 (N.D. Ala. 2018); *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 302 (E.D.N.Y. 2013).

### B. Core FLSA Disputes

### 1. Whether the FLSA Requires a Burden-Shifting Approach in This Case

The parties assume that in *Parker*, the Sixth Circuit adopted a burden-shifting analysis for FLSA claims like this one. For example, Defendants argue that Plaintiff "misrepresents the burden-shifting framework articulated in [*Parker*]" by "omit[ting] the third step of the burden-shifting framework" and neglecting to properly ask whether Defendants' payments "bore a 'demonstrable relationship' to [Plaintiff's] costs." (ECF 81 at 5). At the same time, Plaintiff responds that it is actually Defendants who "misconstrue *Parker*'s burden-shifting framework" by inappropriately raising the threshold for a "prima facie" case, and also by "miss[ing] that the burden . . . shifts to [Defendants] to show 'that the reimbursement bore a demonstrable relationship to the employee's actual costs.'" (ECF 83 at 4 (citing *Parker*, 95 F.4th at at 1019)).

This debate is misplaced. *Parker* did not mandate a burden-shifting framework and mentions burden-shifting only briefly in the opinion's final paragraphs, noting that "the difficultly of proof [in FLSA cases] is arguably similar to that in Title VII cases" and that "[p]erhaps a similar regime" to *McDonnell Douglas* burden-shifting might be used in the FLSA context. *Parker*, 95 F.4th at 1019. Far from setting out a binding framework, the court's language was couched in indeterminacy and speculation. In fact, the Sixth Circuit ended its discussion of burden-shifting by suggesting that "perhaps such an arrangement might not be appropriate" after all, and only that "the district courts might want to consider these or other ideas on remand." *Id.* Following *Parker*'s guidance, this

Court will briefly consider whether burden-shifting is a useful tool for evaluating Plaintiff's claims.

The *Parker* panel suggested that without burden-shifting the Plaintiff's burden of proof might be unfairly high, noting that "the Supreme Court has already reversed our court once (albeit long ago) for a 'standard of proof that ha[d] the practical effect of impairing many of the benefits of the Fair Labor Standards Act,'" where it chose to "lighten somewhat the plaintiffs' burden of proof" because of the defendants' "failure of recordkeeping." *Parker*, 95 F.4th at 1019 (citing *Anderson*, 328 U.S. at 686). But, as discussed above, the records in *Anderson* were quite different from the personal vehicle records in this case. *See supra* at pages 6–7. There, the Court held that it was proper to lighten Plaintiff's initial burden under the FLSA when it was the employer who was "in position to know and to produce the most probative facts" concerning those records. *Anderson*, 328 U.S. at 687. That scenario is flipped here.

Second, there are independent reasons why a *McDonell Douglas*–type analysis does not make sense in cases like this. First, both the Supreme Court and the Seventh Circuit have cautioned against using *McDonnell Douglas* burden-shifting as the sole criterion for evaluating Title VII claims. *See Singmuongthong v. Bowen*, 77 F.4th 503, 508 (7th Cir. 2023); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977) ("The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence"). At the same time, the Supreme Court has cautioned against using the test in a rigid manner. *See Furnco Const.*

*Corp. v. Waters*, 438 U.S. 567, 577 (1978). Given that guidance, it would be particularly inappropriate to port a rigid *McDonnell Douglas*–inspired burden-shifting test to this context. Doing so would violate the "cardinal rule of legal reasoning that one should not 'take judicial language out of its original context and apply it uncritically in a materially different context.'" *Brock v. Robbins*, 830 F.2d 640, 646 (7th Cir. 1987) (quoting *In re Kaiser*, 791 F.2d 73, 76 (7th Cir.)).

Third, *McDonell Douglas* burden-shifting derives its utility from the fact that direct evidence of discriminatory intent is usually "hard to come by." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). Discrimination cases are difficult precisely because discriminatory behavior may be indirect or pretextual rather than direct. Not only may "evidence" of direct discriminatory intent be hard to find, it may not exist at all. *See id.* Thus, *McDonnell Douglas* burden-shifting provides a tool for courts to sort through indirect evidence and decide whether that evidence could lead to an inference of discrimination. *See Napier v. Orchard Sch. Found.*, 137 F.4th 884, 892 (7th Cir.), *cert. denied,* 146 S. Ct. 328 (2025).

The situation here is very different. Plaintiff's FLSA claim does not involve an indirect inference of subjective bad intent from Defendant's objective actions. Rather, as Plaintiff emphasizes, it involves a precise and mathematical claim — whether Plaintiff was paid the proper minimum wage under the FLSA "to the penny" and "free and clear" of any kickbacks. *Parker*, 95 F.4th at 1016 (quoting 29 C.F.R. § 531.35). Unlike in the Title VII context, a plaintiff does not need to show bad intent to establish a violation. Burden-shifting is not appropriate in this context.

10

### 2.   Whether the IRS Reimbursement Rate Complies With the FLSA as a Matter of Law

Plaintiff argues that Defendants' reimbursement scheme violates the FLSA because it was based on averages rather than Plaintiff's specific vehicle expenses. Yet Plaintiff then goes on to propose an "acceptable" but equally average rate: the standard mileage rate used by the IRS, which in this case is higher than the reimbursement rate used by Defendants' third-party provider. But this scheme does not account for Plaintiff's specific costs any better than Defendants' does.

Indeed, Plaintiff's own primary authority rejected an identical argument by the plaintiffs that the IRS rate could be a valid substitute under the FLSA. *Parker*, 95 F.4th at 1017. Employee plaintiffs cannot have it both ways by first arguing that a Defendants' reimbursement rate is inappropriate due to its non-specific nature, and then going on to propose a higher but equally non-specific rate. *Id.* ("the IRS rate does not even purport to measure the vehicle costs of any individual employee"). Rather, the language of the FLSA that "each" employee must be paid the minimum wage directs a particularized inquiry and forecloses an average-based approach when evaluating FLSA claims. *Id.* (quoting 29 U.S.C. § 206(a)(1)(C)).

In fact, as *Parker* noted, the IRS rate may often be a uniquely bad cost approximation due to its highly general nature, as it overestimates costs in some situations and underestimates them in others: *Id.* This Court finds, in line with the

11

FLSA's text and *Parker*'s guidance, that an "average" rate (including the IRS average) never complies with the FLSA as a matter of law. [1]

### 3. Direct Cost Analysis under the FLSA

Although an employer cannot show per se compliance with the FLSA by using an average, neither can an employee claim per se violation of the FLSA on the basis that the employer used an approximation. An average rate may undercompensate employees, but it also may overcompensate them. Thus, a Plaintiff cannot succeed on an FLSA claim merely by showing that the employer used an average reimbursement rate—whether that rate is provided by the IRS, a third party, or otherwise. Rather, the burden is on the employee to show what the FLSA requires: that they were *in fact* paid less than the minimum wage, once all costs that can be directly attributed to employment were taken into account. Defendants cannot rebut an FLSA claim by showing that they paid their employees a fair "average rate." Still, that does not change the fact that it is Plaintiff's burden to show that they were actually underpaid, and by how much. The Court now proceeds to that stage of the analysis.

Plaintiff's evidentiary support for their allegations consists solely of sworn interrogatory responses in which Plaintiff "estimates" a variety of car-related costs.

---

[1] Plaintiff argues that discussion in the DOL "Field Operations Handbook" ("Handbook") suggests that the IRS rate is a sufficient minimum payment under the FLSA. But as *Parker* explained, the Handbook's provision that "[a]s an enforcement policy, the [IRS rate] may be used . . . to determine or evaluate the employer's wage payment practices" is neither relevant to the FLSA's meaning nor binding on courts. *Parker*, 95 F.4th at 1018. First, even on its own terms, the Handbook does not purport to interpret the FLSA's meaning, but only to provide an "enforcement policy" for the DOL's own choice to pursue action. U.S. Dep't of Labor, *Field Operations Handbook* § 30c15 (2026), https://www.dol.gov/agencies/whd/field-operations-handbook. Second, even if the Handbook did purport to declare the FLSA's meaning, it provides no analysis and thus is not entitled to *Kisor* deference. *Orchard Hill Bldg. Co. v. United States Army Corps of Eng'rs*, 893 F.3d 1017, 1027 (7th Cir. 2018).

(ECF 75-3; 75-4). But he provides scant evidence to support these costs. Even Plaintiff's affidavit does not inspire confidence in the proposed numbers, reiterating that they are an "estimate" that "Plaintiff expressly reserves the right to supplement, clarify, revise, or correct any or all of." (ECF 75-3 at 2, 10).

Plaintiff argues that there is no support for the principle that "an employee *must* demonstrate their expenses *only* via records." (ECF 83 at 13) (emphases in original). But that is generally exactly how specific requests for damages work. For example, when requesting specific damages on a motion for default judgment, a party must show that "the amount claimed is liquidated or capable of ascertainment from definite figures contained in the documentary evidence or in detailed affidavits." *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007). (citing *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)). A "conclusory statement" in an affidavit is not sufficient. *e360 Insight*, 500 F.3d at 603. Plaintiff's statements do not clear this bar. Plaintiff cites one case from the Southern District of New York as supporting the proposition that his interrogatory testimony is sufficient to support his claims. (ECF 83 at 13 (citing *Saigon Grill*, 595 F. Supp. 2d at 255)). But that case does not even come close to supporting Plaintiff's requests in this case. There, the employer had not kept records that were its responsibility to maintain. Thus, it was proper for the court to flip the evidentiary burden to the defendant upon a prime facie showing. *See Anderson*, 328 U.S. at 687. But, as discussed above, the records in this case do *not* fall within the FLSA recordkeeping clause's ambit. Moreover, the employer in *Saigon Grill* went farther than merely failing to maintain the records, actually

13

"deliberately destroy[ing]" the data that would have supported Plaintiff's case. *Saigon Grill*, 595 F. Supp. 2d at 255. The court found that, "[u]nder these circumstances the testimony of the plaintiffs as to their hours and pay" deserved additional weight. *Id.* Moreover, the court had other reasons to find Plaintiff's testimony credible because it was both "reasonably precise and quite consistent" and also was "confirmed by a detailed printed schedule for deliverymen at [defendant's location]." *Id.* at 255. Here, the records do not fall within Defendants responsibility under the FLSA, nor is there any collateral indication that Plaintiff's testimony is reliable.

Even if there were no evidentiary problems with Plaintiff's estimates, there is a more fundamental issue with how Plaintiff presents his cost estimates. Plaintiff's cost estimates include the full purchase price of his car ($3,400) as well as what appears to be the total amount of his car insurance and other maintenance and operating costs such as registration, diagnostic exams, tire rotation, brake repairs, and more, totaling $3,862. (ECF 76 at 18).

But these estimates fundamentally misunderstand how anti-kickback reimbursement operates under the FLSA. The FLSA only requires that an employee's work-related costs do not cut into the employee's take home wage. In some cases, this requirement certainly may imply that the employer should cover a tool's full cost. For example, if the tool is relatively specialized or specific to a trade or employer, then it would be improper for the employer to make the employee pay for it, because it would be quite difficult for the employee to recoup the tool cost. *See, e.g.*, *Rivera v. Brickman Grp., Ltd.*, No. CIV. 05-1518, 2008 WL 81570, at *8–9 (E.D. Pa. Jan. 7, 2008) (identifying

14

items like miner's lamps, uniforms, safety caps, and explosives as tools of the trade); *Arnold v. DirecTV, Inc.*, No. 4:10CV00352AGF, 2011 WL 839636, at *2 (E.D. Mo. Mar. 7, 2011) (company-specific uniforms). The FLSA would require the employer to fully reimburse the employee for the purchase price and any upkeep of the "tool." *See id.*

But a personal vehicle is different. First, it is a "tool" that many employees may already possess before they accept a job and is likely something that they will keep and maintain regardless of their work or specific employer. Thus, its purchase (or sale) will often be unrelated or not contingent on the employee's eligibility for employment. The same holds true for vehicle repairs.

Second, personal vehicles are intrinsically multi-use, available for work or leisure. Thus, unlike specialized tools, it cannot be automatically assumed that their use is solely related to employment, and thus a cost that should be borne by the employer under the FLSA. 29 U.S.C. § 206(a)(1)(C). Any cost analysis must carefully account for this.

Third, there is a significant variability between car types and conditions which is often almost entirely unrelated to their direct utility to most types of employment (in this case, delivering pizza). For example, a used 2010 Pontiac Vibe might cost around $3,500,[2] while a brand-new SUV like the Toyota 4Runner might sell for about $57,000.[3] On the facts of this case, an employee would be perfectly able to use either vehicle to perform work functions. It would absurd to harness the FLSA to require employee

---

[2] *2010 Pontiac Vibe Values*, Kelley Blue Book, https://perma.cc/5KZ3-AU7Z.
[3] *2026 Toyota 4Runner Values*, Kelley Blue Book, https://perma.cc/5J5V-GN4F.

reimbursement for non-essential luxury vehicles which the employee made an unrestricted personal choice to spend money on.

Finally, unlike specialized or single-purpose tools, cars are relatively salable[4] assets. There is an extremely large and diverse sales and customer base for cars. While there may be costs associated with depreciation and sales costs, those can be factored into the reimbursement amount. It does not make sense to treat them the same way that the FLSA's analysis would treat a specialized tool or heavily customized work vehicle which might be difficult to sell at all.

Plaintiff argues that the FLSA requires a full reimbursement for the purchase price of his car. But that request is completely untethered to his length of employment, how he specifically used his vehicle, or the realities of economics. Under Plaintiff's reasoning, there is no reason why individuals hired to work for employers like defendants could not sue under the FLSA to be reimbursed for a vehicle's purchase price and then turn around and sell it at profit.

What the FLSA does require is that the employer does not effectively pay less than the minimum wage by requiring the employee to cover expenses that are directly attributable to employment. The question is how to properly evaluate those costs to accurately reflect the precise cost to the employee that is directly attributable to his work.

---

[4] *Salable*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (defining "salable" as "capable of being or fit to be sold; marketable").

16

On all these matters, the evidentiary burden is on the plaintiff. *See Melton v. Tippecanoe County*, 838 F.3d 814, 818 (7th Cir. 2016). To succeed in his claim, Plaintiff must show reliable and precise evidence of the costs borne, and must also provide a rigorous explanation for what portion of those costs can be fairly attributed to the employer. Plaintiff has not met his burden at this point in the case.

## II. FLSA Collective Certification

The FLSA allows for collective actions of "similarly situated" employees. 29 U.S.C. § 216(b). These statutorily authorized "FLSA collective" actions are distinct from a class action under Federal Rule of Civil Procedure 23. A key difference is that a successful FLSA collective requires members to affirmatively opt in rather than opt out. Courts have "wide discretion" in deciding how to implement the FLSA's authorization because the FLSA does not define the specific process for deciding whether an action may be allowed to proceed as a collective,. *Hoffmann–La Roche v. Sperling,* 493 U.S. 165, 171 (1989).

Previously, most courts in the Seventh Circuit used the common "two-step" approach first described by the District Court for the District of New Jersey in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). Under the *Lusardi* approach, Courts would first ask whether the Plaintiff met a minimal evidentiary burden through a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Strait v. Belcan Eng'g Grp.,* 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012). At this stage, the Plaintiff's evidentiary burden was minimal—often, courts would refuse to "make merits determinations, weigh

evidence, determine credibility, or specifically consider opposing evidence presented by a defendant." *Iannotti v. Wood Grp. Mustang*, 603 F. Supp. 3d 649, 653 (S.D. Ill. 2022). After the plaintiff met this burden, courts would then grant what was often referred to as "conditional certification," issuing opt-in notices to potential members.

After discovery, courts would then move on to a second stage, where the defendant would challenge whether the collective's members were similarly situated in light of the evidence. This was a more rigorous review step, where the burden would be on the plaintiffs to show that they were similarly situated with common predominant questions of law and fact such that a collective action would be proper under the FLSA. *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010). In making this determination, courts would often consider factors such as (1) whether the members share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns. *See Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004) (citing *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000)).

The parties operated under this framework, agreeing to conditional certification on April 12, 2024, which the Court granted on June 4, 2024. (ECF 26; 37). Defendants have now moved to decertify the collective at the second stage, arguing that its members are not similarly situated. (ECF 77).

Since then, there has been some development in the law. On August 5, 2025 in *Richards v. Eli Lilly & Co.*, 149 F.4th 901 (7th Cir. 2025), *cert. denied,* 146 S. Ct. 1503 (2026),

the Seventh Circuit rejected the *Lusardi* two-step approach as the primary method for evaluating FLSA collective actions. While acknowledging the "wide discretion" of district courts to manage collective actions, and the general possibility of a workable two-step approach, the court emphasized its duty to "impos[e] guardrails on the exercise of a district court's discretion" and rejected the idea of a "[a] lenient and virtually unrebuttable notice showing" at step one. *Id.* at 909. At the same time, the court rejected the more stringent "preponderance of the evidence" approach adopted by the Fifth Circuit. *Id.* at 911. Rather, the court directed that the step-one analysis requires a "showing that there is a material factual dispute as to whether the proposed collective is similarly situated." *Id.* at 913. At this stage, "[a] plaintiff's evidence of similarity need not be definitive, but defendants must be permitted to submit rebuttal evidence and, in assessing whether a material dispute exists, courts must consider the extent to which plaintiffs engage with opposing evidence." *Id.* Still, the court did not appear to alter the standard for the second step of the analysis. Given that "conditional certification" has already been granted and the parties dispute only step two, *Richards* does not change the analysis at this stage, and the court will proceed to analyze whether Plaintiff has met his burden.

Plaintiff argues that the collective should be maintained because all members worked in the same capacity for Defendants and were all subject to the same Motus mileage reimbursement scheme. But, as Plaintiff himself has emphasized, the FLSA requires a specific inquiry into an employee's work-related costs to determine whether that employee was paid less than the minimum wage. Thus, each employee will have a

different set of facts that dictate whether Defendants violated the FLSA. While each member performed the same general service (pizza delivery), they likely have widely varying cost variables, including their vehicle type and its associated depreciation rate and age, as well as their specific repair, gasoline, and insurance costs. The collective members were not even paid the same mileage reimbursement rate—it varied depending on the location of work as well as car size, class, and age. Due to the varying facts between collective members, it is distinctly possible that the FLSA was violated as to some employees but not others.

Even if Plaintiff could show that Defendants' reimbursement scheme was so low or inadequate as to have necessarily violated the FLSA in almost all cases, that would be insufficient to avoid decertification—the members must also be similarly situated with regard to the amount of damages. *See Camilotes*, 286 F.R.D. at 346. As discussed above, the damages calculus will differ radically between members, even if Plaintiff can show that the FLSA was violated as to all members. Thus, both the liability and damages analysis will require a separate inquiry for each collective member, thereby negating the benefits of combining claims. *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012) ("A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry").

Furthermore, as exhibited in this case by the parties' evidentiary disputes over Plaintiff's motion for summary judgment, there will be unique evidentiary questions for each member. In many other cases (such as here), there will be disputes about the sufficiency or accuracy of the evidence presented. And even when an employee

20

maintained robust and detailed vehicle cost records, those records would have to be authenticated. An FLSA collective would not be in the interest of procedural fairness or judicial economy because a fact-intensive inquiry would be required for each member's claim. *See Camilotes*, 286 F.R.D. at 346; *Pfaahler v. Consultants for Architects, Inc.*, No. 99 C 6700, 2000 WL 198888, at *2 (N.D. Ill. Feb. 8, 2000) (declining to certify a collective when "the court would be required to make a fact-intensive, individual determination as to the nature of each potential claim[].").

Plaintiff cites a variety of state and federal district court cases to support the claim that courts granted similar certification claims. While this Court will not address every single case, two things are worth noting. First, almost all these cases appear to have been decided under the lenient preliminary certification stage, not the stringent second-step analysis. (ECF 84 at 4–6). Thus, they provide no support for Plaintiff's argument at this stage. Second, this Court recognizes that, especially prior to the Sixth Circuit's decision in *Parker*, many courts used the DOL's internal enforcement regulations to interpret the statute's meaning, allowing for the IRS mileage rate as a standard gauge for an appropriate reimbursement. *See supra* note 1; *Parker*, 95 F.4th at 1017. Under that scheme, damages determinations might have been far simpler. But, as explained above, the FLSA does not allow for the IRS mileage rate to stand in for an individualized determination. Under the correct individualized approach, it is hard to see how a court would allow certification at the second stage. The Court finds Plaintiff has not met his burden to show that collective members are similarly situated for purposes of the FLSA. De-certification of the FLSA collective is appropriate.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for summary judgment (ECF 75), and **GRANTS** Defendants' motion to deny final FLSA collective certification and dissolve the conditional collective (ECF 77).

SO ORDERED on August 6, 2026.

                                              /s/*Cristal C. Brisco*

                                              CRISTAL C. BRISCO, JUDGE

                                              UNITED STATES DISTRICT COURT